Mark E. Andrews (TX Bar No. 01253520)
Jeffrey R. Fine (TX Bar No. 07008410)
Aaron M. Kaufman (TX Bar No. 24060067)
Jane Gerber (TX Bar No. 24092416)
**DYKEMA GOSSETT PLLC**
1717 Main Street, Suite 4200
Dallas, TX 75201
Phone: (214) 462-6400
Fax: (214) 462-6401
Email: mandrews@dykema.com
Email: jfine@dykema.com
Email: akaufman@dykema.com
Email: jgerber@dykema.com

**PROPOSED COUNSEL FOR DEBTOR AND DEBTOR-IN-POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** § § | **CHAPTER 11 CASE** |
| **FC BACKGROUND LLC, d/b/a FC CONSTRUCTION SERVICES,** § § § § | **CASE NO. 19-32037-sgj-11** |
| Debtor. § § § | |

**DECLARATION OF IRA D. WALKER
IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF**

| | |
|---|---|
| **THE STATE OF TEXAS** § § | |
| **COUNTY OF DALLAS** § | |

I, Ira D. Walker, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information and belief:

1. My name is Ira D. Walker. I am over the age of eighteen, and am fully competent to make this Declaration. I have never been convicted of a felony or crime of dishonesty or moral turpitude.

2. I am the Chief Executive Officer ("CEO") of FC Background LLC, dba FC Construction Services ("FC Construction" or the "Debtor"), the debtor and debtor-in-possession

in the above captioned case (the "Case"). I have worked for FC Construction for approximately 11 years, including that last two years as the CEO.

3. As CEO, I am familiar with operations of the Debtor and its books and records. I have personal knowledge of the facts stated herein, or such facts are based on my review of the Debtor's operations, including the Debtor's books and records, and on the information and interviews conducted by me and my staff and professional advisors with the Debtor's officers, members, and employees.

4. I submit this Declaration in support of the various motions discussed below (the "First Day Motions") that the Debtor is filing on or shortly after the commencement of the Case on June 19, 2019 (the "Petition Date").

## I. BACKGROUND

### A. *Debtor's History and Business*

5. The Debtor was formed in 2000 by Mark Hughes and Mark Hinton, initially called HR First Contract, LLC. The name was changed to FC Background, LLC in 2006. Today, in recognition of the Debtor's expanded services discussed below, the Debtor does business as FC Construction.

6. Initially, the Debtor's business generated revenue by offering workforce screening for new employees at local and national companies operating in the DFW metroplex. The screening services the Debtor currently offers includes (i) verifying an employee's government issued identification; (ii) checking an employee's criminal history in local, state and federal records; (iii) checking sex offender registrations; (iv) verifying education and employment records; (v) checking driving records; (vi) confirming trade licenses and certifications; and (vii) drug testing.

7. The Debtor now offers these screening services at six (6) locations: four (4) in DFW, one (1) in Houston, Texas, and one (1) in Miami, Florida. The Debtor also coordinates with over 3,000 sample collection clinics for certain drug screenings. Each facility employs two or three full-time employees. The Debtor serves a variety of business customers: large independent school districts, local colleges and universities, and large and small construction companies. In many cases, a new employee for the Debtor's customers will visit one of the six storefront locations where the Debtor's staff will complete the verifications required by the customer's business needs. At the end of this process (often only thirty minutes), the Debtor's staff can confirm the employee's information and, as applicable, provide the appropriate credentials required for the employee's new job.

8. Beginning in approximately 2012 and 2013 the Debtor expanded its business and sources of revenue by and began offering Access Control services to its construction customers. Access Control is a two pronged system. First, Access Control "on-boards" new employees at a project, such as a construction site, by verifying their identity and issuing credentials to each employee, typically in the form an identification badge. The Debtor enters into contracts with employers to provide these services and charges by each identification badge it provides. Second, the Debtor installs specialized turnstiles at defined entries at the employee's work site. These turnstiles formalize the entry and exit points at a worksite, and control employees' movement through their previously issued identification badges. These turnstiles and other proprietary technology developed by the Debtor monitor employees' ingress and egress at the work site and enable the Debtor to provide valuable work-related metrics to the Debtor's customers. Following the success of these services to its construction customers, the Debtor expanded and now provides the same or similar services to customers at sporting venues,

hospitals and other large employers. The Debtor generates revue through its turnstiles by assessing deployment and installation charges.

### B.  *Debtor's Financial Condition*

9.  The Debtor is primarily a service business which generates revenues in the manner described above. The Debtor has expanded steadily over the last five or six years but has not had sufficient working capital. The capital structure of the Debtor is relatively simple.

10.  The primary secured lender to the Debtor is Gulf Coast Bank and Trust Company ("Gulf Coast"). Gulf Coast is owed approximately $3,500,000 secured by a lien on accounts receivable, inventory, equipment and general intangibles. The loans originated through CapitalSprings SBLC, LLC, which in 2017 merged into Gulf Coast. The apparent value of the accounts receivable as of the Petition Date is about $1,400,000. The value of the inventory is negligible (card stock for id badges). The Debtor's furniture, fixture and equipment, which includes the turnstile related equipment, has a book value (after depreciation) of approximately $7.8 million. Although the Debtor believes the fair market value of such assets will be much lower, to the extent such assets may even be sold. The software and proprietary systems have no known market value.

11.  The Debtor owes an aggregate of approximately $700,000 to five different merchant lenders (collectively, the "Merchant Lenders"): (i) BizFund, LLC; (ii) On Deck Capital, Inc.; (iii) ML Factors Limited Liability Company ("ML Factors"); (iv) Influx Capital, LLC; and (v) Kalamata Capital Group. Of the five Merchant Lenders, only ML Factors has taken steps to assert and perfect an interest in collateral. ML Factors has filed a UCC-1 to perfect its purported interests in the Debtor's accounts receivable. On information and belief, however, even if ML Factors can assert a valid lien on the Debtor's assets, such liens are second

in time to the liens asserted by Gold Coast, which is likely to be undersecured. As such, the Debtor believes ML Factors and all other Merchant Lenders are unsecured creditors.

12. The Debtor has unfortunately built up a substantial debt to the IRS. This occurred because Debtor believed it would be able to close a sale or refinance of the business and was in serious talks throughout 2018 with a West Coast based fund. When that transaction did not close as anticipated, the Debtor fell behind on certain tax obligations. As a result, the Debtor owes the IRS approximately $1,950,000 in taxes, plus interest and penalties.

13. The Debtor owes equipment lenders on specific pieces of equipment. These agreements will be reviewed by Debtor to determine if they are leases or secured transactions, but as a preliminary matter, it appears that these obligations total approximately $800,000 with equipment collateral worth about half of this amount.

14. In addition to the above, Debtor estimates that as of the Petition Date it will have trade debt of approximately $1.8 million.

C. *Events Leading to the Bankruptcy Filing*

15. Over the course of 2018 as the Debtor continued to expand but ran into liquidity issues; management believed that a sale or an investment in the company would provide needed liquidity. Unfortunately, the negotiations over a long period simply did not result in the consummation of the anticipated transaction. While the company continued to grow, it outran its working capital capabilities. The result was that management first sought capital from short term, high interest merchant lenders. The Merchant Lenders described above offered short term money at high rates, resulting in daily and weekly draws on the Debtor's bank accounts totaling approximately $30,090.00 per day. These obligations quickly became unsustainable.

16. In addition to the Merchant Lenders, the Debtor was unable to fulfill its tax obligations and began accruing a sizable debt to the IRS. This grew to over 1,950,000 by the time of the filing in taxes, plus penalties and interest.

17. Shortly before the filing, first the IRS seized approximately $90,000 from the Debtor by setting off bank accounts and filed a notice of lien for approximately $981,000. Next, ML Factors effectuated a setoff on funds held in the Debtor's bank account using a prepetition confession of judgment as a remedy. Such actions threatened to shut down the Debtor, putting payroll in jeopardy. The Debtor and ML Factors have entered into a settlement agreement to allow Debtor to continue to operate, make payroll and provide certain other consideration.

18. These actions set the stage for further business interruption which the Debtor can ill afford. After the seizures, the Debtor's management determined that a Chapter 11 would be necessary to preserve the value of the Debtor's business.

### D. *Goal of the Bankruptcy Case and Proposed Plan of Reorganization*

19. The Debtor has worked to develop a business plan over the last several months. The Debtor is considering changes to its business model by focusing on more profitable work, changing some of its business model, and reducing overhead. The Debtor believes those steps will put the company on a path to profitability. The Debtor intends to work through issues with its lenders and expects to propose a plan of reorganization in these proceedings in the near term.

20. While the Debtor will focus on a reorganization, there is a recognized need for capital which could be satisfied in a number of different ways. The Debtor will also evaluate potential transactions, including a sale, refinancing or recapitalization of all or parts of the company as part of its endeavors.

## II. FIRST DAY MOTIONS

### A. *Complex Case Designation*

21. The Debtor has also filed a Notice of Designation as a Complex Chapter 11 Bankruptcy Case, which I understand from my counsel is in accordance with the General Orders of the Court when commencing the contemplated complex case. I believe this designation is warranted because (a) the total claims asserted against the Debtor exceeds the $10 million threshold, and (b) there are over two hundred (200) creditors and parties in interest in this Case. Based on these factors, I believe the Debtor is entitled to a complex chapter 11 case treatment of this Case, which will allow the Debtor and its counsel to use a limited service list, and set hearings on a more frequent basis. I believe such treatment will help the Debtor complete an effective and efficient restructuring through this Case without incurring unnecessary administrative costs or prejudicing the interests of creditors or parties-in-interest.

### B. *Cash Collateral Motion*

22. The Debtor operates background screening services at six (6) storefront locations in Texas and Florida, and offers Access Control services at construction sites and additional large venues nationwide. The Debtor has approximately $3,500,000 in secured debt, and owes approximately $2,000,000 in unpaid taxes. The Debtor has pledged its account receivables and equipment as collateral for its secured debt. In order to continue its operations, Debtor needs access to its ordinary operating revenues and requests that pursuant to the budget attached to the Cash Collateral Motion, its operations remain undisturbed.

### C. *Employee Wages and Benefits*

23. The Debtor's operations, by their nature, require an extensive labor force. The Debtor employs approximately 134 persons across the country, including approximately 70

people in its corporate office. The wages and benefits motion describes the payroll cycle, which is bi-weekly, the benefits components including health insurance and other benefits, including payment of insurance premiums. It is important to the service of its customers that these wages and benefits be maintained without interruption so that the Debtor can continue to provide appropriate services. The wages and benefits provided to the employees are market for the area and customary for this kind business.

### D.  *Tax Payment Motion*

24.  In the course of its operations, the Debtor is responsible for collecting and remitting various taxes directly to the applicable taxing authority (the "Prepetition Taxes"). The Debtor estimates that it currently owes approximately $1,988,888.87, plus applicable penalties and interest, in the aggregate in such Prepetition Taxes ((a) Federal Payroll Tax: $1,950,513.00; (b) Garnishments in Texas: $1,107.72; (c) State Payroll Tax: $32,119.83; and (d) Federal Unemployment Tax: $5,148.32).

25.  The Debtor requests authority to remit any state or local taxes collected in the course of its operations to the applicable taxing authorities (the "Taxing Authorities"). Also, to the extent that any checks paying such Prepetition Taxes have not cleared the banks as of the Petition Date, the Debtor seeks an order authorizing the Debtor's banks to honor the checks, and to rely on the Debtor's representations as to which checks may and may not be cleared, without any liability to any third party. In addition, to the extent the Taxing Authorities have otherwise not received payment for the Prepetition Taxes due to them, the Debtor seeks authorization to issue replacement checks, or to provide for other means of payment to the Taxing Authorities.

E. *Insurance and Premium Financing Motion*

26. The non-paid up insurance policies (the "Insurance Policies") maintained by the Debtor are as follows:

(a) a professional liability and network risk policy with an effective date of April 15, 2019, and an expiration date of April 15, 2020, and a total yearly premium of $19,267.51, inclusive of a broker fee, a surplus line tax, and a stamping office fee ("Professional Liability Policy");

(b) a cyber liability policy with an effective date of April 15, 2019, and an expiration date of April 15, 2020, and a total yearly premium of $8,938.00, inclusive of taxes ("Cyber Liability Policy");

(c) an excess liability policy with an effective date of April 15, 2019, and an expiration date of April 15, 2020, and a total yearly premium of $16,275.00, inclusive of taxes ("Excess Liability Policy");

(d) a general liability policy with an with an effective date of April 15, 2019, and an expiration date of April 15, 2020, and a total yearly premium of $30,249, inclusive of taxes ("General Liability Policy");

27. All of these Insurance Policies are financed by AFS/IBEX, a division of MetaBank (the "Premium Lender"). The Premium Lender has senior security interests in the proceeds of these financed Insurance Policies to the extent of any unpaid obligations owed by the Debtor. The total remaining amount owed on the financing for the Insurance Policies as of the Petition Date is $52,125.30, and this financing carries interest at an effective annual percentage

rate of 4.51%. The financing calls for nine more monthly payment of $5,791.70, due on the 15th day of each month.[1]

28.     While there may be a grace period allowed under the premium finance agreements before the policies can be cancelled, the Debtor may suffer irreparable harm if they do not obtain immediate relief to pay these Insurance Financing Obligations as they become due. If these payments are not made, the Premium Lenders may have the right under applicable non-bankruptcy law to cancel the Insurance Policies or the Insurance Policies may be automatically terminated. The Debtor must continue the Insurance Policies to preserve the value of its estate and to comply with various laws, regulations, and contract obligations that apply to the Debtor's assets and operations. Many of the Debtor's secured loan agreements and other equipment loans require their assets to be insured, and failing to maintain that insurance could cause those lenders to obtain leave from the Court to foreclose on their assets before losses occur.

### F.    *Extension of Deadlines to File Schedules and SOFA*

29.     The substantial size and complexity of FC Construction's operations complicates its ability to assemble and compile such information within the first 14 days of the Petition Date in an accurate, complete, and cost-effective manner. FC Construction is efficiently staffed and has limited personnel available to review such information in the early stage of this Case, especially given the increased workload placed such personnel by the other requirements of the Case. The personnel and professional advisors who are needed to complete the Schedules and SOFA must also devote time and attention to business operations to preserve and maximize the value of FC Construction's going concern and bankruptcy estate.

---

[1] As of the Petition Date, the Debtor has not made its monthly payment for June 2019.

## III. CONCLUSION

30. For the reasons provided above, and after due consideration, it is my business judgment and the business judgment of the Debtor that the First Day Motions and related relief should be granted.

**[Remainder of the page left blank; Signature to follow]**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, on this __th day of June, 2019.

/s/ _____
Ira D. Walker